Adja DIOP, Appellant,

v.

ZENITH LOGISTICS; Hon. Udell B. Levy, Administrative Law Judge; and Workers' Compensation Board, Appellees.

NO. 2015–CA–000822–WC

Court of Appeals of Kentucky.

RENDERED: DECEMBER 23, 2015; 10:00 A.M.

Brief for Appellant: Joy L. Buchenberger, Louisville, Kentucky.

Brief for Appellee, Zenith Logistics: Lee Jones, Rachel Wagner Kennedy, Louisville, Kentucky.

BEFORE: COMBS, J. LAMBERT, AND VANMETER, JUDGES.

*OPINION*

LAMBERT, J., JUDGE:

Adja Diop has petitioned this Court for review of the opinion of the Workers' Compensation Board (the Board) reversing and remanding the opinion, award, and order of the Administrative Law Judge (ALJ). Because we hold that the ALJ acted within his discretion, we reverse the Board's decision.

Diop is a thirty-eight-year-old resident of Louisville, Kentucky. In 2006, Diop began working for Zenith Logistics as an order selector in the warehouse, which involved moderate physical work. She claims to have sustained work-related injuries to her mid and low back on December 21, 2013, and February 20, 2014, while pulling on a stuck door and twisting, respectively. She sought treatment for her low back complaints at Occupational Kinetics, Jewish Hospital East, and River City Health.

Diop filed a Form 101 Application for Resolution of Injury Claim on April 30, 2014, seeking benefits for her injury.[1] Zenith contested Diop's claim, alleging that her injury arose due to a fall in her bathtub.

Diop testified by deposition. She was born in Africa, where she lived for nine years before moving to Europe. She lived in Europe for thirteen years before coming to the United States to perform Judo professionally. At the time of her deposition, she was coaching Judo. She had stopped Judo and lifting weights before her alleged injury, but she continued to ride bikes and use the treadmill at the gym. She began working at Zenith in 2006, and her current position was in the utility pool. She would fill in empty spots. At the time of her deposition, she was earning approximately $21.97 per hour and working approximately 40 hours per week on the 6:00 pm to 2:30 am shift. She was not working under any restrictions and planned to continue working for Zenith.

In describing the December 21, 2013, work incident, Diop stated that she was attempting to pull a door that was stuck. She felt pain in her back the second time she attempted to pull it. She was by herself at the time because she had come in early. She called the office to let her supervisor, Tony Schildknecht, know. Tony got ice her for to use on her back, and they filled out an incident report. She believed she sought medical treatment two or three days later. Zenith referred her to Dr. Bee, who saw Diop in December 2013 prior to her fall in the bathtub. Dr. Bee did not refer her to Jewish Hospital for x-rays. Rather, Diop went to the emergency room on her own after she fell in a bathtub on December 27th. She said that she was asleep and woke up to use the toilet. She could not sit down so she decided to use the bathtub instead. She fell while in the bathtub. She was alone

---

1. Diop filed two claims, No. 2014–86663 and No. 2014–86664, which were consolidated by the ALJ during the course of the proceedings.

The record on appeal only contains the Form 101 for No. 2014–86664.

when this happened, and she drove herself to the hospital. She was concerned that she had injured her kidney. Diop continued to work after that time and treat with Dr. Bee.

On February 20, 2014, Diop experienced more back pain while she was twisting at work. She said that she did not recall a specific incident but that her back continued to worsen. She was fulfilling orders that night by "picking" grocery boxes. She told the supervisor, but she could not remember that person's name. No one was with her when this happened. Diop sought treatment from Union Chiropractic, and she was also referred to River City Health Services. She went to the chiropractor three times per week for about 20 visits, and she used her insurance to pay those bills. She was off work for a few weeks until the chiropractor released her to return to work. She stopped treating with the chiropractor in May 2014. Diop had not treated with any other provider and was not taking any medication for her back. She continued to wear a back brace if she was picking.

With her Form 101, Diop filed the records of Dr. Peter Urda, which are detailed below, as well records from Occupational Kinetics. Diop was first seen at Occupational Kinetics by chiropractor Dr. Alan M. Bee on December 24, 2013, for her complaints of low back pain that had started three days earlier on December 21st. Diop told him that "she was lifting a garage door that was stuck, so she yanked on it and it opened." She stated that she immediately felt pain in her lower back and that she had been taking ibuprofen and using ice to help relieve the pain. Dr. Bee set up a treatment schedule of two visits per week for three weeks. Later records filed by Zenith established that Dr. Bee last saw Diop on February 20, 2014, for her low back complaints. At that

time, she was fit for full-duty work, no longer required any care for her complaints, and had not reported any new complaints. In further support of her claim, Diop filed the records of Union Chiropractic Injury & Rehabilitation Center, where she sought treatment for her back pain in April and May of 2014. The chiropractor recommended a lumbar support for work.

Zenith filed the medical records of Dr. Urda. Dr. Urda saw Diop on February 27, 2014, noting a chief complaint of a strained mid to low back. She reported an injury date of December 21, 2013, and that she had sought treatment elsewhere prior to this visit. Dr. Urda obtained records from Jewish Hospital East, where she had sought treatment, which revealed a history of falling in the bathtub. X-rays taken December 21, 2013, revealed no fractures of the lumbar spine. Dr. Urda diagnosed sprains of the thoracic and lumbar regions as well as rib sprain. All conditions were uncomplicated and stable. The carrier was to investigate whether her injury was work-related based upon the history of her fall in the bathtub. Diop went back for a recheck on March 3, 2014, and Dr. Urda prescribed Flexeril and performed a Kenalog injection to reduce inflammation and pain in her back. Diop returned for follow-up care on March 10, March 21, April 4, and April 14, 2014.

Zenith also filed the medical records of Jewish Hospital Medical Center East. The records establish that Diop presented to the emergency room on the morning of December 27, 2013, for a back injury and back pain. She reported a sudden onset of pain seven days previously and described the mechanism of her injury as a fall in the bathtub. X-rays of her back were negative, and she was diagnosed with a back contusion. She was prescribed Flexeril and naproxen for pain.

In further support of its defense, Zenith filed the report and supplemental report of Dr. Ellen Ballard. Dr. Ballard performed an independent medical examination on August 21, 2014. After obtaining a history from Diop, Dr. Ballard reviewed Diop's medical records and performed a physical examination. Dr. Ballard did not find any evidence of a work-related injury on December 21, 2013, or February 20, 2014, noting instead that Diop had reported a strain on December 21, 2013, at the same time she had reported back pain after falling in a bathtub. Based upon the AMA *Guides*, Diop did not have any impairment based on the alleged work-related injury, but noted that she might have a 5% pre-existing impairment due to her fall. Dr. Ballard went on to state that Diop had the capacity to perform her job, did not have any permanent restrictions, and did not require any further treatment or medication as related to the alleged work-injury dates. Zenith filed a supplemental report from Dr. Ballard dated September 16, 2014, in which she stated that additional reports from Union Chiropractic dated after the alleged February work incident were not related to either of her alleged work injuries.

The ALJ held a benefit review conference (BRC), where the parties stipulated to jurisdiction under the Act; that an employment relationship existed; that Diop sustained alleged work-related injuries on December 21, 2013, and February 20, 2014; that Diop provided timely notice of the first alleged injury date; that no temporary total disability (TTD) or medical benefits were paid; that her average weekly wage was $1,117.68 for the first injury date and $1,049.82 for the second one; that she retained the physical capacity to return to her regular job; that she had returned to work after both injury dates; that her date of birth was August 5, 1977; that she had completed two years of college; and that she did not have any vocational or specialized training. Contested issues remained extent and duration, causation, notice as to the second injury date, medical expenses, injury as defined by the Act, and TTD benefits. Zenith later moved to extend proof time and to add the issue of a pre-existing active condition to the list of contested issues. The ALJ granted both motions. Diop moved to amend the BRC order to include fraud as a contested issue pursuant to KRS 342.465. Zenith objected to this motion.

Diop later filed the August 25, 2014, medical report of Dr. Jules Barefoot, who performed an independent medical examination. Dr. Barefoot concluded that the medical records, specifically a report from Jewish Medical Center East, did not support her claimed history of a workplace injury and that she did not have a ratable impairment attributable to an incident at work.

Finally, Zenith filed the deposition testimony of John Carlos Johnson, Zenith's regional safety manager. Mr. Johnson explained that Zenith is the Kroger Distribution Center in Louisville. In his job as the safety manager, Mr. Johnson, who is a registered nurse, would respond to, assess, and treat all injuries or refer the worker to someone else. He could also handle all administrative requirements concerning an injury, including injury and FTE reports, and help injured workers transition back into the workplace. Regarding Diop, Mr. Johnson completed an injury management chronology report, something that would be completed for an alleged injury that was either questionable or required prolonged care.

Mr. Johnson became aware of Diop's December 21, 2013, alleged injury when he was notified by her supervisors. Diop had

started her shift before her scheduled start time of 6:00 pm and reported her injury at 5:50 pm. He said it was unusual for her to clock in early. Mr. Johnson came in to check on Diop, who told him that she felt pain in her lower back after jerking on a door that was jammed. The supervisor that night, as well as Mr. Johnson, checked the door in question, but they did not find anything wrong with it. Once the incident was reported, Mr. Johnson pulled Diop from the floor. When he went to check on her, Mr. Johnson found her sitting in the bathroom eating pizza. He checked on her several times that night and stated that he had to coach her from doing anything strenuous because he found her doing activities such as chair squats.

On December 24, 2013, three days after her injury, the company took Diop to Occupational Kinetics, a chiropractic office, at her choice. Diop had two sessions per week for two weeks, where she received proactive care as well as massages and chiropractic treatment. Diop went back to her regular job at that point but reported some additional problems, so she received two additional treatments. Her final follow-up with Dr. Bee was on February 20, 2014. Diop had continued to work light-duty during that time. Diop returned to full-duty work in early January 2014. She did not express any problems, even on February 20, 2014, when he and Dr. Bee both talked with her. Diop had worked on the night of February 19th, leading into the morning of February 20th. Mr. Johnson saw her sometime after 5:00 in the afternoon of the 20th, just prior to her appointment with Dr. Bee. Diop did not work that night, and she had not told him about a twisting injury that day. The supervisor that night, Brian Presley, did not report that Diop had told him of any accident during that shift. Mr. Johnson did not know about this injury until the insurance adjuster notified him of it, after

it had come up in a telephone interview. On February 24, 2014, Diop called Mr. Johnson to report that she was still having problems in the same location. The company made arrangements for her to see Dr. Urda at River City Health, and she first saw him on February 27th.

Mr. Johnson said the company decided to deny Diop's claim regarding the second incident due to inconsistencies in the report and when it learned of her fall in the bathtub from Dr. Urda in late February. Diop was currently working full-duty without any restrictions, special accommodations, or complaints.

At the final hearing on September 24, 2014, the ALJ denied Diop's motion to amend to allege fraud and granted Zenith's motion to amend to include the issue of a pre-existing active condition. The ALJ also ordered simultaneous briefs. During the hearing, the ALJ heard additional testimony from Diop. She testified about the day of her initial injury on December 21, 2013, and that she first sought treatment from Dr. Bee a few days later. She stated that she went to Jewish Hospital on December 27, 2013, after she fell in the bathtub. When asked about the records from Jewish Hospital that reported she fell in the bathtub seven days prior to her visit, Diop explained that there was a misunderstanding because she told them she had fallen in the bathtub that day. Diop also testified about the re-injury to her back on February 20, 2014, when she twisted her back while picking. She saw Dr. Urda for treatment after this injury. She then went to see a different chiropractor, but she stopped treatment there because she could not afford the payments. Diop stated that she was no longer treating with any medical provider and had returned to her regular job at Zenith. She said that she still experienced low back pain when she had to pick quickly and that

her back would be numb after she went home when she had been picking. If she worked a sit-down position, her back would not bother her. She used a lumbar brace while she was picking.

Following the hearing, Diop moved to submit the August 5, 2014, report of Dr. Barefoot. Zenith objected to the late filing of the report, and the ALJ denied Diop's motion.

The parties filed simultaneous briefs arguing their respective positions. Diop argued that she was entitled to an award of permanent partial disability (PPD) benefits based upon the medical evidence. She also requested TTD benefits and payment of her medical expenses. Zenith contended that Diop had failed to meet her burden of proving that she had experienced work-related injuries on either December 21, 2013, or February 20, 2014, and that she was not entitled to an award of any benefits.

The ALJ rendered an opinion, award, and order on November 17, 2014. In determining that Diop had sustained an injury as defined by the Act, the ALJ relied upon Dr. Urda's finding of point tenderness in her spine and tenderness in her paravertebral muscles. He also relied upon Dr. Ballard's measurements showing at least a 1cm difference in the circumference of her calf muscles. The ALJ stated that "[t]hese factors provide objective evidence of a harmful change."

Turning to whether Diop had fallen in the bathtub prior to the date her work injury occurred, the ALJ stated that Diop had testified consistently in her deposition and at the hearing that she had fallen in the bathtub after she had strained her back at work. "She was observed during her testimony at the final hearing and found to be extremely credible." The ALJ further stated that the records from Occupational Kinetics provided documentation of treatment prior to Diop being seen in the emergency room. The AJL ultimately concluded that Diop's history as related by the providers at Jewish Medical Center East was inconsistent with the history and treatment Occupational Kinetics had documented and that the Jewish Medical Center East personnel "simply misstated what [Diop] told them." The ALJ believed Diop had testified consistently that she fell in the bathtub because of the symptoms that had arisen due to her prior back injury, which had been caused by her lifting incident at Zenith. In line with this conclusion, the ALJ applied the direct and natural consequence rule to hold that her injury at work caused Diop's mobility to be compromised, affected her ability to engage in a basic bodily function (urinating on the toilet), and consequently caused her to fall in the bathtub while she was using an alternate method to engage in this bodily function.

The ALJ did not assign any of Diop's impairment to a pre-existing disability or impairment and held that the February 2014 incident was "simply a continuation of the original injury." Therefore, Diop had provided adequate notice to Zenith when she notified her employer in December. The ALJ also held that all of the treatment Diop had received had been reasonably necessary to relieve the effects of her work injury and were therefore compensable. The ALJ did not award any TTD benefits because she had missed less than two weeks of work and was ineligible to receive an award.

In assigning an impairment rating, the ALJ relied upon Dr. Ballard's 5% permanent partial impairment rating based on the fall in the bathtub, which the ALJ noted was given without reviewing the records from Occupational Kinetics. The ALJ stated that "[s]ince [Zenith] is liable for the effects from the fall regardless, as

well as any effects from the lifting incident, the evidence in this case shows [Diop] has sustained this 5% permanent partial impairment as a result of the work injury." Therefore, the ALJ awarded Diop PPD benefits at a rate of $18.35 per week for 425 weeks beginning on December 12, 2013.

Zenith filed a petition for reconsideration, arguing that there was no medical evidence or opinion to support causation of a work-related injury or relating the fall in the bathtub to a work-related injury and that the ALJ erred in concluding that the history recorded at Jewish Medical Center East was misstated because it did not coincide with the records from Occupational Kinetics. The ALJ denied the petition for reconsideration, finding that it was merely a reargument of the merits of the case and that Zenith did not point out any patent errors to justify reconsideration.

Zenith appealed to the Board, which reversed and remanded the ALJ's rulings. The Board agreed with Zenith that substantial evidence did not support the ALJ's finding that Diop had experienced a permanent work injury for which she had incurred a 5% permanent impairment rating. While noting that the medical records were contradictory, the Board held that "the ALJ could choose to believe Diop experienced back pain at work and her injury on December 21, 2013, was not due to a fall in the bathtub."

However, the Board went on to hold that the ALJ's findings were not supported by the medical evidence submitted in this case. Specifically, the Board agreed with Zenith's argument that the ALJ's statement regarding involuntary contraction of muscles was "a conclusion drawn by the ALJ unsupported by the medical evidence." Dr. Barefoot also concluded that the medical records did not support her reported history of a work injury, and Dr. Ballard identified no evidence of a work injury on either December 21, 2013, or on February 20, 2014, and could not assess an impairment based on either alleged injury date. Dr. Ballard did not identify the fall when she mentioned that Diop may have a 5% pre-existing active impairment due to a fall. But even assuming she was referring to the fall in the bathtub, "Dr. Ballard did not attribute that fall to a physical condition caused by the December 21, 2013, work injury." Dr. Ballard's statement that she may have an active impairment did not reach the level of a medical probability. The Board also agreed with Zenith that the ALJ erred in solely relying on Diop's unverified statements to resolve the issue of causation. Here, the Board stated that causation could only be established with medical evidence, and there was no medical evidence to support the findings the ALJ made connecting the fall in the bathtub to the alleged work injury a few days earlier.

Therefore, the Board reversed the awards of PPD and permanent medical benefits because the medical evidence did not support the ALJ's determination that Diop had sustained a work-related back injury. However, the Board determined that the ALJ could reasonably conclude that Diop had sustained a temporary work injury, and it remanded the matter for a determination of whether she had sustained a temporary work injury and was entitled to medical benefits. This petition for review now follows.

On appeal, Diop's sole argument is that the ALJ was within his discretion in finding that she had sustained a work-related back injury that resulted in a 5% impairment rating. Zenith contends that the record lacks any medical evidence to support a finding of causation, as held by the Board.

This Court's standard of review in workers' compensation appeals is well-settled in the Commonwealth. "The function of further review of the [Board] in the Court of Appeals is to correct the Board only where the Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *Western Baptist Hosp. v. Kelly,* 827 S.W.2d 685, 687–88 (Ky. 1992).

Kentucky law establishes that "[t]he claimant in a workman's compensation case has the burden of proof and the risk of persuading the board in his favor." *Snawder v. Stice,* 576 S.W.2d 276, 279 (Ky.App. 1979) (citations omitted). "When the decision of the fact-finder favors the person with the burden of proof, his only burden on appeal is to show that there was some evidence of substance to support the finding, meaning evidence which would permit a fact-finder to reasonably find as it did." *Special Fund v. Francis,* 708 S.W.2d 641, 643 (Ky. 1986). However, "[i]f the board finds against a claimant who had the burden of proof and the risk of persuasion, the court upon review is confined to determining whether or not the total evidence was so strong as to compel a finding in claimant's favor." *Snawder,* 576 S.W.2d at 280 (citations omitted). Furthermore, we recognize that:

> The ALJ, as the finder of fact, and not the reviewing court, has the sole authority to determine the quality, character, and substance of the evidence. *Paramount Foods, Inc. v. Burkhardt,* Ky., 695 S.W.2d 418 (1985). Where, as here, the medical evidence is conflicting, the question of which evidence to believe is the exclusive province of the ALJ. *Pruitt v. Bugg Brothers,* Ky., 547 S.W.2d 123 (1977).

*Square D Co. v. Tipton,* 862 S.W.2d 308, 309 (Ky. 1993). Because the decision favored Diop, we must determine whether there was some evidence of substance to support the ALJ's findings.

Although a court cannot substitute its evaluation of the weight and credibility of the evidence for that of the Workmen's Compensation Board, nevertheless, the findings of fact of the board when it decides in favor of the claimant must be supported by substantial evidence. Substantial evidence means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men.

*Smyzer v. B.F. Goodrich Chemical Co.,* 474 S.W.2d 367, 369 (Ky. 1971).

In establishing causation, or work-relatedness, we recognize that, "[w]hen a causal relationship between injury and [condition] is not apparent to laymen, the question is one properly within the province of medical experts and the Board may not disregard the medical evidence." *Elizabethtown Sportswear v. Stice,* 720 S.W.2d 732, 733 (Ky.App. 1986), citing *Mengel v. Hawaiian–Tropic,* 618 S.W.2d 184 (Ky.App. 1981). Here, the ALJ relied on Diop's testimony to tie the medical evidence from Occupational Kinetics, which documented the work injury, to the Jewish Hospital records, which documented her fall in the bathtub. In making this finding, the ALJ was well within his broad discretion to both assess Diop's credibility and believe her version of the events that caused her injury. In conjunction with the medical evidence establishing that Diop had sustained an injury, there was substantial evidence to support the ALJ's conclusion that her injury arose in the course and scope of her employment. In reversing the ALJ's decision, the Board

improperly construed the controlling case law, and its decision must be reversed.

For the foregoing reasons, the opinion of the Workers' Compensation Board is reversed, and the ALJ's opinion awarding benefits is reinstated.

ALL CONCUR.